**ROXANA SANDOVAL**
California State Bar No. 292327
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Roxana_Sandoval@fd.org

Attorneys for Mr. Williams

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JONATHAN JUSTIN WILLIAMS,<br><br>Defendant. | CASE NO.:  21-cr-0478-DMS<br><br>Hon. Dana M. Sabraw<br>Date:  September 30, 2022<br>Time: 11:00 a.m.<br><br>**REPLY IN SUPPORT OF MOTION TO DISMISS THE INFORMATION UNDER THE SECOND AMENDMENT** |

## I.    Introduction

In his Motion to Dismiss, Mr. Williams raised a constitutional challenge to the information's felon-in-possession count. *See* 18 U.S.C. § 922(g)(1). The motion relied on the Supreme Court's watershed decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), which overhauled the test for determining when a law violates the Second Amendment.

The motion explained that *Bruen*'s new test had abrogated prior Ninth Circuit precedent rejecting Second Amendment challenges to § 922(g)(1). Motion ("Mot.") 4–11. Applying this test, the motion then surveyed over three centuries of gun laws and showed that the government could not point to an established tradition of denying individuals with felonies the right to keep and bear firearms. Mot. 11–24.

The government strives mightily to hold back *Bruen*'s sea change. But because *Bruen*'s mode of analysis controls and reveals no historical tradition of denying

people convicted of felonies access to firearms, this Court should dismiss the information.

## II.   Argument

### A.   *Bruen* provides the *only* relevant test for determining whether a gun law is constitutional.

To try to negate *Bruen*'s impact, the government leans its full weight on the Supreme Court's references to "law-abiding citizens" and "presumptively lawful" felon-in-possession laws, as well as circuit court decisions taking their cues from these phrases. Opposition ("Opp.") 3-11. But this argument ignores the heart of the Second Amendment: its plain text and the historical analysis used to interpret it.

### 1.   The Second Amendment's plain text protects felons' right to keep and bear arms, triggering a full historical analysis.

The plain text of the Second Amendment states that the "right of the people to keep and bear Arms[ ] shall not be infringed." U.S. Const. amend. II. The government does not deny that this language covers the charged conduct. *See Bruen*, 142 S. Ct. at 2126 ("[W]e hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."). Nor does it point to anything in this plain text or the history surrounding it that exempts felons or Mr. Williams in particular. *See Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (explaining that, at the Founding, felons were not "categorically excluded from our national community" or "strip[ped] . . . of the right to bear arms simply because of their status as felons") (Barrett, J., dissenting). So from the outset, the government bears a heavy burden to show that a person who falls within the plain text of the Second Amendment is nevertheless excluded from that right.

The government tries to duck that obligation using Supreme Court precedent. Yet the government never points to a single Supreme Court case rejecting a Second Amendment challenge to § 922(g)(1) or any other felon-in-possession law. Nor can it, as no such case exists. Instead, the government relies exclusively on language in

*Bruen* and *D.C. v. Heller*, 554 U.S. 570 (2008), referencing "law-abiding citizens" and describing felon-in-possession restrictions as "presumptively lawful." Opp. 3-8.

The key flaw in the government's argument is that neither *Bruen* nor *Heller* analyze the constitutionality of felon-in-possession laws. *Bruen* held that Second Amendment challenges require courts to 1) look at the Amendment's plain text and 2) decide whether the government has shown a historical tradition of regulating conduct that falls within it. *See Bruen*, 142 S. Ct. at 2129–30. But neither *Heller* nor *Bruen* purported to find that felon-in-possession laws fell outside the Amendment's plain text or within a historical tradition of regulation. It would be absurd if *Bruen* and *Heller* could somehow "hold" that § 922(g)(1) is constitutional without undertaking the core analysis that their own opinions demand.

The better reading is that *Bruen* and *Heller* exercised judicial restraint by leaving the question of § 922(g)(1)'s constitutionality for another day, when courts could apply their historical methodology to a fully-developed record. This is exactly what then-Judge Barrett said in her *Kanter* dissent (and the majority did not disagree): that "[t]he constitutionality of felon dispossession was not before the Court in *Heller*," so it "explicitly deferred analysis of this issue." 919 F.3d at 453.

The absence of any historical authority accompanying *Bruen*'s and *Heller*'s comments confirms this. *Bruen* and *Heller*'s bedrock holding was that historical authority and sources control our understanding of the Second Amendment. *See Bruen*, 142 S. Ct. at 2127–29; *Heller*, 554 U.S. at 579–626. But the *Bruen* majority (and concurrences) cite no authority for their "law-abiding" and "presumptively lawful" comments other than *Heller*. *See Bruen*, 142 S. Ct. at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156–61. And *Heller* cites no founding-era laws, cases, or other sources excluding felons from Second Amendment protection. *See* 554 U.S. at 625–26, 635. So while "some of *Heller*'s language does link Second Amendment rights with the notion of 'law-abiding citizens,'" *Heller* "never actually addressed the historical pedigree of felon dispossession laws." *Kanter*, 919 F.3d at 445 (simplified).

3

Because neither *Heller* nor *Bruen* applied their own methodology to determine whether § 922(g)(1) violates the Second Amendment, this Court must do so now.

### 2.   *Bruen*'s mode of analysis abrogated Ninth Circuit case law.

The government next argues that the motion did not meet the "high standard" of showing that *Bruen* is "clearly irreconcilable" with Ninth Circuit precedent on § 922(g)(1). Opp. 9. (quoting *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc)). But once again, the government fails to recognize that *Bruen*'s mode of analysis is fundamentally incompatible with the reasoning of those decisions.

Under *Miller*, a Supreme Court decision can abrogate lower court precedent in two ways: (1) through its express holding, or (2) through its "reasoning or theory" or "mode of analysis." 335 F.3d at 900 (quoting Antonin Scalia, *The Rule of Law as a Law of Rules,* 56 U. Chi. L.Rev. 1175, 1177 (1989)). Here, *Bruen*'s "reasoning" and "mode of analysis" is that courts must declare unconstitutional any conduct falling within the plain text of the Second Amendment that is not consistent with the Nation's historical tradition. *See* 142 S. Ct. at 2129–30. Thus, while *Bruen*'s express holding overruled cases employing means-ends scrutiny, its mode of analysis abrogates *any* case upholding a gun law without full textual and historical review.

The Ninth Circuit's § 922(g)(1) case law does just that. The government concedes that the "central rationale" of *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010), and its progeny is their "reliance on *Heller*'s discussion of felon-in-possession laws." Opp. 10. But as explained, neither *Heller* nor *Bruen* conducted the type of full historical survey necessary to determine whether felon-in-possession laws are constitutional. *See Kanter*, 919 F.3d at 445 (stating that *Heller* "never actually addressed the historical pedigree of felon dispossession laws"). Indeed, *Vongxay* itself quoted *Heller*'s language admitting that it simply had "not undertake[n] an exhaustive historical analysis today of the full scope of the Second Amendment" or applied this to the "presumptively lawful categories." *Id*. (quoting *Heller*, 554 U.S. at 626 & n.26). So *Heller*'s incomplete analysis (and the government's concession that

4

1   *Vongxay* relied on it) merely confirms that *Vongxay* is "clearly irreconcilable" with

2   *Bruen*. *Miller*, 335 F.3d at 900.

3          *Bruen*'s treatment of concealed carry confirms that—contrary to *Vongxay*—

4   *Heller*'s preliminary conclusions are subject to testing and revision. In *Heller*, the

5   Court tentatively interpreted the historical record to mean that "prohibitions on

6   carrying concealed weapons are lawful." *Heller*, 554 U.S. 570, 626 (2008). But in

7   *Bruen*, the plaintiffs claimed that a New York law prohibiting most concealed carry

8   was unlawful. *Bruen*, 142 S. Ct. at 2122. If *Heller*'s preliminary conclusions were

9   dipositive and unassailable, this claim would have been rejected without further

10  analysis. Instead, however, the Court performed a full historical analysis, then held

11  that the "[concealed carry] licensing regime violate[d] the Constitution." *Id*. Thus,

12  though the government tries to deny it, *Bruen*'s final holding (deeming a concealed

13  carry prohibition unlawful) revised *Heller*'s tentative conclusion ("prohibitions on

14  carrying concealed weapons are lawful") after a full review.

15         Finally, *Bruen*'s "law-abiding" and "presumptively lawful" language do not

16  alter these conclusions. As explained above, these phrases are not part of *Bruen*'s

17  holding or reasoning. They are legal asides delineating unresolved questions not

18  presented. So under *Miller*, it is *Bruen*'s plain text and historical *methodology*—not

19  its "law-abiding" and "presumptively lawful" language—that binds lower courts.

**B.    The government failed to show that § 922(g)(1) is part the
         Nation's historical tradition of firearm regulation.**

20

21         The government fails to meet its burden to show that § 922(g)(1) "is consistent

22  with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at

23  2134. The government points to no historical laws disarming felons, instead resorting

24  to arguments addressed—and rebutted—in the original motion. *See* Mot. 12–13.

25         If anything, the government's response is notable for how much it agrees with

26  the original motion's analysis. The government agrees that some well-credentialed

27  people conclude that history does not support § 922(g)(1)'s constitutionality. *See*

28

Opp. 12. It agrees that "the English never tried to disarm all felons" and, instead, relied on sureties "and more limited disarmament." *Id.* at 13. It concedes that at least by the 1800s American "penalties for many felonies began to decrease and forfeiture of estates fell into disuse." *Id.* at 14. The government even agrees that the "Court should not over-weight" proposed versions of the constitutional right to keep and bear arms that were not adopted, *id.* at 17, and that 20th-century history, which witnessed the birth of felon dispossession laws, "is not especially relevant here," *id.* at 19. Most striking, the government acknowledges that "[p]erhaps someday the Supreme Court will accept some version of Defendant's historical analysis." *Id.* at 20.

The government's agreement (or acknowledgement that history is at least ambiguous) creates an insurmountable problem. If there are "multiple plausible interpretations" of a historical regulation, courts should "favor the one that is more consistent with the Second Amendment's command." *Bruen*, 142 S. Ct. at 2141 n.11. Here, it is undisputed that the Amendment's plain text covers the charged conduct. *See* Mot. 11. Thus, by its own admission, the government has not met its burden to show that § 922(g)(1) is consistent with the Nation's tradition of firearm regulation.

1. **The government must cite distinctly similar historical regulations—it cannot rely on historical analogies or general "understandings."**

Even absent these concessions, the government's evidence comes up short. This is largely due to two, overarching defects in the government's reasoning.

First, almost all of the government's evidence—from felon execution to "virtue" theory—purports to show that the public would not have "understood" the Second Amendment to bar § 922(g)(1). Opp. 13-16. But nebulous "understandings" do not satisfy *Bruen*'s strictures. *Bruen* requires evidence that § 922(g)(1) "is consistent with this Nation's historical tradition of firearm *regulation*." 142 S. Ct. at 2126 (emphasis added). The government can meet its burden only with actual *regulations*. *Id*. at 2131–34. General understandings—

6

never codified in regulations—carry no weight. *Id.*; *see also Firearms Pol'y Coal., Inc. v. McCraw*, 2022 WL 3656996, at \*7 (N.D. Tex. Aug. 25, 2022) (rejecting arguments based on "general Founding-Era attitudes"). For the same reason, the government cannot use the excuse that early legislators regulated "above the [constitutional] floor." Opp. 13. *Bruen* teaches that founding-era regulations *establish* the constitutional floor. All contrary cases are overruled.

Second, because felons with access to firearms is a "general societal problem that has persisted since the 18th century," the government must cite a "distinctly similar historical regulation" to justify § 922(g)(1). Mot. 6, 12 (quoting *Bruen*, 142 S. Ct. at 2134). But the government does not do so. Nor could it—the first felon disarmament law appeared in the 20th century. Mot. 12. Rather than point to similar regulations, the government tries to rely on "historical analogue[s]." Opp. 5. But *Bruen* teaches that analogical reasoning is reserved for regulations that implicate "unprecedented societal concerns," "dramatic technological changes," or regulations "unimaginable at the founding." *Bruen*, 142 S. Ct. at 2132. The government does not even try to show that this characterizes § 922(g)(1).

### 2.  The government's evidence fails on its own terms.

Even if *Bruen* permitted the government to rely on historical analogues or nebulous "understandings," the regulations it cites are nothing like § 922(g)(1).

### (a)  Many Founding-era felons were not executed.

The government's focus on 17th-century British and American openness to execution misses the point that many felons *were not* executed and there were no known laws prohibiting them from owning firearms after their punishment. The government does not dispute that. And as noted in the original motion, the prior prevalence of execution is a non sequitur. "The obvious point that the dead enjoy no rights does not tell us what the founding-era generation would have understood about the rights of felons who lived, discharged their sentences, and returned to society." *Kanter*, 919 F.3d at 462 (Barrett, J., dissenting).

7

Many felons fell in the latter category. Historical research shows that, by the Founding, "[d]eath . . . no longer inevitably followed a felony conviction." *Id.* at 459. Even before, a version of "benefit of clergy" or a pardon spared many. Nancy J. King, *The Origins of Felony Jury Sentencing in the United States*, 78 Chi.-Kent L. Rev. 937, 948–49 (2003) ("'[S]carce a single horse-stealer suffered death,' so many were pardoned."). And from 1786 to 1796, three states passed laws "impos[ing] imprisonment at hard labor for a specified list of crimes that had formerly been capital crimes." Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*, 57 Clev. St. L. Rev. 461, 468–70 (2009).

In short, many felons escaped death. But far from *prohibiting* them from bearing arms, founding-era laws *required* "each and every" able-bodied man to join armed militias—with no exception for felons. *Heller*, 554 U.S. at 596 (quoting Act of May 8, 1792, 1 Stat. 271). This defeats any inference that felons were disarmed.

**(b)     Loyalty oaths are not similar to § 922(g)(1).**

The government also points out that some colonies disarmed people who refused to swear an oath to the new Nation seeking independence. *See* Opp. 14-15. But those laws disarmed people who might assist "hostile attemp[t]s of the British fleets and armies," i.e., who posed an imminent threat of violence. *See* Act of Mar. 14, 1776, ch. VII, 1775-1776 Mass. Act at 31–32, 35; Mot. 16–17. And even those who took up arms against the government in Shay's Rebellion were disarmed for a mere three years, after which the state gave back the weapons used to rebel. *See* Mot. 17.

**(c)     Rejected proposals from states' ratification conventions have no bearing on the Second Amendment's text.**

Unable to cite sufficiently similar *enacted* historical regulations, the government turns to three *proposed* restrictions on the right to bear arms from the state ratification conventions. It bears repeating that not one of those regulations made it into the Second Amendment's text, and the government agrees that "Court should not over-weight" them. Opp. 19.

8

But even if one considers the proposals on the merits, they do not help the government. For example, New Hampshire's proposal would disarm only those who "are or have been in *actual rebellion*." *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting). Actual "rebellion" meant "traiterous taking up arms, or a tumultuous opposing the authority of the king, etc. or supreme power in a nation." *Id.* (quoting *Rebellion*, 2 *New Universal Etymological English Dictionary* (4th ed. 1756)). That is a far cry from disarming anyone ever convicted of any felony. *See* § 922(g)(1).

Samuel Adams' proposal in Massachusetts, meanwhile, would limit the arms right to the "peaceable." *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting). But even that does not sweep "so broadly that it encompasses all criminals, or even all felons." *Id.* "'[P]eaceable' was defined as '[f]ree from war; free from tumult'; '[q]uiet; undisturbed'; '[n]ot violent; not bloody'; '[n]ot quarrelsome; not turbulent.'" *Id.* (quoting 1 Samuel Johnson, *A Dictionary of the English Language* (5th ed. 1773)). Breachers of the peace did not merely commit a crime, but violated "the public peace, as by a riot, affray, or any tumult which is contrary to law, and destructive to the public tranquility." *Id.* (citation omitted). Plus, under common practice at the time, such people have had a right to possess guns for self-defense. *See* Mot. 19 n.6.

Pennsylvania's proposal might be interpreted to prevent *anyone* convicted of *any* crime (even misdemeanors) from bearing arms. *See Kanter*, 919 F.3d at 456 (Barrett, J., dissenting). But, at some point, common sense prevails. For reasons given in the motion, that interpretation cannot be squared with Founding-era American practice. *E.g.*, *id.* Thus, "it seems best to read this phrase as contemplating disarmament not for any crime committed—wildly overbroad even by current standards—but for crimes demonstrating that a person poses a 'real danger of public injury.'" Marshall, *supra*, at 729. Whatever the "Pennsylvania minority's" influence, a questionable interpretation of a rejected proposal cannot trump text and practice.

Lacking support in primary sources, the government cites Stephen Halbrook's *The Founders' Second Amendment* for the proposition that the Amendment lacked

"an explicit exclusion of criminals from the individual right to keep and bear arms, because this . . . was understood." Opp. 16; *see also United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (citing same). But neither in that paragraph, nor elsewhere in the book, does Halbrook offer any citation for that claim.

### (d)   The government offers no sound support for its virtuous citizen theory of the Second Amendment.

Finally, the government relies on *Vongxay*'s conclusion "that most scholars of the Second Amendment agree that the right to bear arms was 'inextricably . . . tied to' the concept of a 'virtuous citizen[ry]' *Vongxay*, 594 F.3d at 1118 (simplified); Opp. 19-21. There are two problems with this argument. *See* Mot. 20.

First, even *Vongxay* acknowledged that "the historical question has not been definitively resolved" as to virtue. *Id.* And, once again, ambiguity necessarily means that the government failed to meet its burden. *See Bruen*, 142 S. Ct. at 2141 n.11.

Second, *Vongxay*'s assessment of history relied on sources that, themselves, lacked sources beyond each other. As one jurist colorfully put it, tracing the origins of virtue theory is like unpacking "the layers of a matryoshka doll." *Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897, 915 (3d Cir. 2020) (Bibas, J., dissenting). Kates's *Dialogue* merely cited Kates's prior article for his virtuousness claim. *Id.* at 916. And Kates's prior work merely cited the three state ratification convention proposals discussed above, which did not mention virtuousness. *Id.* Reynolds *Critical Guide*, too, merely cites Kates's *Dialogue*. *Id.* This does not prove a historical pedigree.

### (e)   These points apply equally in the circumstances of Mr. Williams's case.

For all the same reasons, the government has not met its burden to show that 922(g)(1) can be applied in Mr. Williams's particular circumstances. The government points out that he has been convicted of crimes defined as felonies. Opp. at 21-22. But the Ninth Circuit has responded skeptically to the notion that "Congress[] and the States[] [may] define any old crime as a felony and thereby

10

use it as the basis for a § 922(g)(1) conviction, consistent with the Second Amendment." *United States v. Phillips*, 827 F.3d 1171, 1176 (9th Cir. 2016). And contrary to the government's contention, there is no evidence that Mr. Williams is "likely to misuse firearms." Opp. at 20 (quoting *Kanter*, 919 F.3d at 464, 468 (Barrett, J., dissenting)). The government has proffered no evidence of past firearms misuse, and generalized allegations of bad behavior are not enough.

## IV.    Conclusion.

For these reasons, this Court should dismiss the information or hold an evidentiary hearing.

Respectfully submitted,

Dated:  September 26, 2022        *s/ Roxana Sandoval*

Federal Defenders of San Diego, Inc.
Attorneys for Jonathan Justin Williams
Email:  Roxana_Sandoval@fd.org